UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
SAUL R. HYMES and ILLANA HARWAYNE-
GIDANSKY, on behalf of themselves and all others
similarly situated,

                          Plaintiffs,

              - against -

BANK OF AMERICA, N.A., and Does 1 through 10,
inclusive,

                        Defendants.

-------------------------------------------------------------------X

ALEX CANTERO, individually and on behalf of all
others similarly situated,

                        Plaintiff,

              - against -

BANK OF AMERICA, N.A.,

                        Defendant.
-------------------------------------------------------------------X

**MEMORANDUM AND ORDER**
18-CV-2352 (RRM) (ARL)

18-CV-4157 (RRM) (ARL)

ROSLYNN R. MAUSKOPF, United States District Judge.

Plaintiffs Saul Hymes and Illana Harwayne-Gidansky (the "Hymes Plaintiffs"), and

plaintiff Alex Cantero (collectively with the Hymes Plaintiffs, "Plaintiffs"), bring this pair of

putative class actions against Bank of America, N.A. ("the Bank"), seeking to require the Bank

to pay interest, as required by New York General Obligation Law ("GOL") § 5-601, on money

Plaintiffs have deposited into mortgage escrow accounts.  Before the Court are the Bank's nearly

identical motions to dismiss the complaints in each action for failure to state a claim pursuant to

Federal Rule of Civil Procedure ("Rule") 12(b)(6).  In each motion, the Bank principally argues

that the National Bank Act ("NBA") preempts GOL § 5-601 and that Plaintiff's claims for

breach of contract, unjust enrichment, and violation of state consumer protection law must therefore be dismissed. The motions are consolidated for the purposes of this Memorandum and Order.

For the reasons set forth below, the Court concludes the NBA does not preempt GOL § 5-601. Accordingly, Plaintiffs' complaints state valid claims for breach of contract. Plaintiffs' claims for unjust enrichment and violation of New York General Business Law § 349 are dismissed.

## BACKGROUND

### I. The NBA and Dodd–Frank

"In 1864, Congress enacted the NBA, establishing the system of national banking still in place today." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 10–11 (2007) (citations omitted). The NBA created the Office of the Comptroller of the Currency ("OCC") to oversee nationally chartered banks, and it vested those banks with certain enumerated powers. Since the early twentieth century, this has included the power to "make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate." 12 U.S.C. § 371(a); *accord* 12 C.F.R. § 34.3(a).[1] The NBA also vested national banks with "all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; . . . [and] by loaning money on personal security." 12 U.S.C. § 24 (Seventh). Pursuant to these powers, throughout the past century, national banks have engaged in the business of making residential real estate loans secured by mortgages.

---

[1] The precursor to section 371, which authorized national banks to make limited-duration loans secured by farmland, was enacted in 1913. *See* Pub. L. No. 63-43, § 24, 38 Stat. 251, 273 (1913). The statute evolved over the ensuing years into its current, more comprehensive form.

While Congress delegated regulation of national banks to the OCC, it did not "wholly withdraw" them "from the operation of State legislation." *First Nat'l Bank v. Kentucky*, 76 U.S. (9 Wall.) 353, 361 (1869). "It is often said that we have a 'dual banking system' of federal and state regulation." *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005) (citations omitted). In this system, and as will be discussed more fully below, national banks are subject to state law, provided the state law does not "prevent or significantly interfere with the national bank[s'] exercise of [their] powers." *Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996). When state law does prevent or significantly interfere with banks' exercise of their powers, it is preempted by the NBA. *Id.*

## II.     Mortgage Escrow Accounts, RESPA, and GOL § 5-601

Since at least the middle of the twentieth century, mortgage lenders have required or negotiated with borrowers to establish mortgage escrow accounts. *See Gibson v. First Fed. Sav. & Loan Ass'n of Detroit*, 504 F.2d 826, 829 (1974) (describing regulation of mortgage escrow accounts); *cf.* Edwin S. Mills, *The Functioning and Regulation of Escrow Accounts*, 5 Hous. Pol'y Debate 203, 203 (1994) ("Escrow accounts are the stepchildren of the mortgage business."). A mortgage escrow account, sometimes called an impound account, is "a trust account set up in a borrower's name to ensure the timely payment of specified obligations affiliated with a property." H.R. Rep. No. 111-94, at 53 (2009). Borrowers pre-pay a set amount into their accounts on a regular, often monthly, basis. *Id.* Lenders "then use these collected sums to guarantee the timely payment of property tax bills and insurance premiums." *Id.* By guaranteeing timely payment, lenders protect themselves and the borrowers from tax liens and property damage risk. *Id.* In turn, having mitigated these risks, lenders are able to offer loans to

borrowers at reduced interest rates. *See* Mills, *supra*, at 209. When the mortgage contract ends, any money remaining in escrow is returned to the borrower.

For some mortgages, such as those with a low risk of default, these benefits may not outweigh the countervailing costs. Mortgage escrow accounts cost money for lenders to create and operate – an expense which may be borne by the lender or passed to the borrower. *See, e.g.*, *Escrow Requirements Under the Truth in Lending Act (Regulation Z)*, 78 Fed. Reg. 4726, 4746–47 (Jan. 22, 2013). They also necessarily require that borrowers be parted from control of their capital, and thus from the ability to use it, including to generate income. *See id.* During the period between when monthly deposits are required and taxes and insurance premiums come due, money belonging to the borrower simply accumulates in escrow. The lender may use this money to generate interest and income for itself, but the borrower has no access to it. *See id.*; Mills, *supra*, at 211.

By the 1970s, some lenders had begun to exploit this last feature of mortgage escrow accounts by requiring borrowers to deposit vastly more money than their tax and insurance liabilities demanded. *See* S. Rep. No. 93-866, 1974 U.S.C.C.A.N. 6546, 6548. These lenders could then invest this money for their own benefit, effectively giving themselves an interest-free loan for however long the mortgage escrow account remained in place.

In 1974, Congress and the State of New York responded with consumer protection legislation aimed at curbing different aspects this practice. At the federal level, Congress enacted the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, which capped the amount lenders – including national banks – could require in escrow deposits for federally insured, guaranteed, or owned mortgages. *See* Mills, *supra*, at 211–12. And Congress delegated authority to implement RESPA to the Department of Housing and Urban Development

("HUD"). *See* Pub. L. No. 93-533, § 3(6), 88 Stat. 1724, 1725 (1974). Under RESPA, lenders can now demand only so much as necessary to guarantee the timely payment of taxes and insurance premiums, and no more. *See* 12 U.S.C. § 2609.

At the state level, New York enacted GOL § 5-601, which required "mortgage investing institutions," including national banks, to pay interest to borrowers on the money in mortgage escrow accounts, thereby passing along some (or all) of whatever interest or income they made. *See Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178, 181 (2d Cir. 2005) (first citing N.Y. Gen. Oblig. Law § 5-601, then citing N.Y. Banking Law § 14-b(5)); *see also* 1974 N.Y. Laws 802–05. Specifically, New York General Obligations Law § 5-601 provides,

> Any mortgage investing institution which maintains an escrow account pursuant to any agreement executed in connection with a mortgage on any one to six family residence occupied by the owner . . . and located in this state shall, for each quarterly period in which such escrow account is established, credit the same with dividends or interest at a rate of not less than two per centum per year based on the average of the sums so paid for the average length of time on deposit or a rate prescribed by the superintendent of financial services pursuant to section fourteen-b of the banking law and pursuant to the terms and conditions set forth in that section whichever is higher.

N.Y. Gen. Oblig. Law § 5-601. Over the next two decades, approximately a dozen states enacted similar laws. *See* 1973 Conn. Acts 1373–74 Reg. Sess; 1991 Me. Laws 187; Mills, *supra*, at 214.[2]

## III.   OCC Involvement

At no point during this period did the OCC seek to impose escrow-account regulations on national banks over and above what HUD required. Through a series of informal agency actions,

---

[2] As detailed in Cantero's amended complaint, thirteen states now have escrow interest laws. (Cantero Am. Compl. at ¶ 79); *see also infra* note 10.

it merely asserted that the NBA authorized national banks to offer escrow services, subject to RESPA and HUD regulations. *See* OCC Corporate Decision No. 99-06, 1999 WL 74103, at *2 (Jan. 29, 1999) (concluding that, under 12 U.S.C. § 24 (Seventh), "national banks are authorized to provide real estate closing and escrow services to their loan or title policy customers as activities that are part of or incidental to the business of banking" (citations omitted)); OCC Conditional Approval No. 276, 1998 WL 363812, at *9 (characterizing mortgage escrow accounts as "an integral part of or a logical outgrowth of the lending function" and "part of and incidental to the Bank[s'] lending and servicing function").

In 2004, however, the OCC's approach changed. Responding to "increasing efforts by states and localities to apply state and local laws to bank activities," the agency published a final rule "clarifying the applicability of state law to national banks' operations," and identifying "types of state laws that are preempted, as well as the types of state laws that generally are not preempted, with respect to national banks' lending, deposit-taking, and other operations." *Bank Activities and Operations; Real Estate Lending and Appraisals*, 69 Fed. Reg. 1904, 1904, 1908 (Jan. 13, 2004). The rule amended the OCC's real estate lending preemption regulations, codified at 12 C.F.R. § 34.4, by more than doubling the list of categories of state law preempted by the NBA. *Compare Real Estate Lending and Appraisals*, 69 Fed. Reg. at 1917, *with* 12 C.F.R. § 34.4(a) (2003). Ostensibly applying the Supreme Court's decision in *Barnett Bank*, the rule provided,

> (a) Except where made applicable by Federal law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized real estate lending powers do not apply to national banks. Specifically, a national bank may make real estate loans under 12 U.S.C. 371 and § 34.3, without regard to state law limitations concerning:
>     . . .

> > (6) Escrow accounts, impound accounts, and similar
> > accounts; . . . .

*Real Estate Lending and Appraisals*, 69 Fed. Reg. at 1917.

The OCC did not offer any basis for the inclusion of escrow accounts, in particular, on the list. It did not state, for example, that it had consulted with HUD, or that it had determined state regulation regarding escrow accounts, in particular, had encroached too far on the federal domain.[3] Instead, it offered several general defenses of the revised list as a whole. It asserted that the list "reflects our experience with types of state laws that can materially affect and confine—and thus are inconsistent with—the exercise of national banks' real estate lending powers." *Id.* at 1911. It emphasized in general terms the paramount importance of "enable[ing] national banks to operate to the full extent of their powers under Federal law . . . ." *Id.* at 1908. And it claimed that preemption of some state consumer protection laws was acceptable given the "scant" evidence that national banks – as opposed to the "subprime mortgage and finance companies that dominate mortgage lending" – engaged in predatory lending practices. *Id.* at 1913–14 & n.73. For the next six years, this regulation remained unchanged.

## IV.    Dodd–Frank

Between 2007 and 2008, the national housing market collapsed, precipitating the worst financial crisis since the Great Depression. *See generally* FIN. CRISIS INQUIRY COMM'N, *supra*. In 2010, in an effort to prevent a future collapse, Congress enacted the Dodd–Frank Wall Street Reform and Consumer Protection Act ("Dodd–Frank"), Pub. L. No. 111-203, 124 Stat. 1376–2223 (2010). *See* S. Rep. No. 111-76, at 2 (2010). Three parts of the Act are relevant to this case. First, Dodd–Frank concentrated rulemaking authority over consumer-protection laws in

---

[3] The notice of proposed rulemaking included no more detail on these questions than did the final rule. *See Real Estate Lending and Appraisals*, 68 Fed. Reg. 46,119, 46,119–32 (Aug. 5, 2003).

the newly created Bureau of Consumer Financial Protection ("CFPB"). Thus, the responsibility for promulgating regulations under RESPA – previously the work of HUD – was transferred to the CFPB. *See* Dodd–Frank tit. X, 124 Stat. at 1955–2113.

Second, in an effort to "stop[] or mitigat[e] a number of abusive and deceptive practices related to escrow accounts, mortgage servicing, and appraisal practices," H.R. Rep. No. 111-94, Dodd–Frank amended the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, by enacting 15 U.S.C. § 1639d. Section 1639d requires "creditors," including national banks, to maintain mortgage escrow accounts on behalf of borrowers with federally guaranteed or insured loans (and other loans not relevant here) for a period of at least five years. *See id.* § 1639d(a)–(b); H.R. Rep. No. 111-94, at 49.[4] For all accounts thus mandated, section 1639d regulates the

---

[4] In full, subsections (a) and (b) read:

(a) In general

Except as provided in subsection (b), (c), (d), or (e), a creditor, in connection with the consummation of a consumer credit transaction secured by a first lien on the principal dwelling of the consumer, other than a consumer credit transaction under an open end credit plan or a reverse mortgage, shall establish, before the consummation of such transaction, an escrow or impound account for the payment of taxes and hazard insurance, and, if applicable, flood insurance, mortgage insurance, ground rents, and any other required periodic payments or premiums with respect to the property or the loan terms, as provided in, and in accordance with, this section.

(b) When required

No impound, trust, or other type of account for the payment of property taxes, insurance premiums, or other purposes relating to the property may be required as a condition of a real property sale contract or a loan secured by a first deed of trust or mortgage on the principal dwelling of the consumer, other than a consumer credit transaction under an open end credit plan or a reverse mortgage, except when--

(1) any such impound, trust, or other type of escrow or impound account for such purposes is required by Federal or State law;

(2) a loan is made, guaranteed, or insured by a State or Federal governmental lending or insuring agency;

(3) the transaction is secured by a first mortgage or lien on the consumer's principal dwelling having an original principal obligation amount that--

(A) does not exceed the amount of the maximum limitation on the original principal obligation of mortgage in effect for a residence of the applicable size, as of the date such interest rate set, pursuant to the sixth sentence of section 1454(a)(2) of title 12, and the

payment of interest thereon, providing, "If prescribed by applicable State or Federal law, each creditor shall pay interest to the consumer on the amount held in any impound, trust, or escrow account that is subject to this section in the manner as prescribed by that applicable State or Federal law."  *Id.* § 1639d(g)(3).

Section 1639d became effective on January 21, 2013.  *See Lusnak v. Bank of America, N.A.*, 883 F.3d 1185, 1197 (9th Cir. 2018).  The next day, on January 22, 2013, the CFPB promulgated a final rule implementing its provisions.  *See Escrow Requirements Under the Truth in Lending Act*, 78 Fed. Reg. at 4726.  In the accompanying notice of rulemaking, the agency plainly acknowledged that 1639d(g)(3) makes state escrow interest laws like GOL § 5-601 applicable to lenders.  *See id.* at 4744–47 ("Depending on the State, the creditor might not have to pay interest on the money in the escrow account.").  It did not, however, consider or address 1639d(g)(3)'s applicability to national banks, in particular.  Nor did it discuss what preemptive significance, if any, that provision might have.

Third, in Title X, Dodd–Frank cabined the OCC's authority to wield the NBA to preempt state consumer protection laws.  As relevant, it accomplished this in several ways.  First, it clarified the preemption standard to be applied to such laws, providing that they

> are preempted, only if— . . . in accordance with the legal standard for preemption in [*Barnett Bank*], the State consumer financial law prevents or significantly interferes with the exercise by the national bank of its powers . . . .

---

annual percentage rate will exceed the average prime offer rate as defined in section 1639c of this title by 1.5 or more percentage points; or

(B) exceeds the amount of the maximum limitation on the original principal obligation of mortgage in effect for a residence of the applicable size, as of the date such interest rate set, pursuant to the sixth sentence of section 1454(a)(2) of title 12, and the annual percentage rate will exceed the average prime offer rate as defined in section 1639c of this title by 2.5 or more percentage points; or

(4) so required pursuant to regulation.

12 U.S.C. § 25b(b)(1).  Second, it imposed limitations on when and to what extent the OCC

could make preemption determinations.  It required future "determination[s] . . . concerning the

impact of a particular State consumer financial law" to be made "case-by-case" and in

"consult[ation] with the [CFPB]."  *Id.* § 25b(b)(3).  Third, it made clear that only *Skidmore*

deference applies to the OCC's preemption determinations.  Specifically, it mandated that courts

reviewing those determinations not give them any heightened deference, but instead assess them

"depending upon the thoroughness evident in the consideration of the agency, the validity of the

reasoning of the agency, the consistency with other valid determinations made by the agency,

and other factors which the court finds persuasive and relevant to its decision."  *Id.* §

25b(b)(5)(A).

## V.     The OCC's Subsequent Regulations

In 2011, acknowledging that Dodd–Frank's preemption provisions "may have been

intended to change the OCC's approach," the OCC revisited its 2004 preemption regulations.

*See Dodd–Frank Act Implementation*, 76 Fed. Reg. 43,549, 43,556 (July 21, 2011).  Upon

review, the agency rearranged some wording, but it declined to alter its extensive list of

preempted state laws, asserting that its decision to include these items was fully consistent with

the "preemption standard of the *Barnett* decision."  *Id.*  As revised, the regulation now provides,

> (a)     A national bank may make real estate loans . . . without
> regard to state law limitations concerning:
> . . .
>  (6)     Escrow accounts, impound accounts, and similar
>  accounts; . . . .
> (b)     State laws on the following subjects are not inconsistent with
> the real estate lending powers of national banks and apply to
> national banks to the extent consistent with [*Barnett Bank*]:
> . . .
>  (9)     Any other law . . . that is made applicable by Federal
>  law.

12 C.F.R. § 34.4 (2019).

Because these changes did not alter the list, the OCC believed it was not bound by Dodd–Frank's case-by-case requirement to justify its decision with respect to each category of state law on the list. *Dodd–Frank Act Implementation*, 76 Fed. Reg. at 43,557. As such, it did not consult with CFPB regarding the continued validity of the escrow account preemption regulation. And although the OCC offered justifications for some other items on the list, it once again declined to specifically explain or defend the escrow account regulation. *Id.*

## VI.   Plaintiffs' Mortgages

Plaintiffs in these actions have two types of mortgage escrow accounts with Bank of America, neither of which is mandatory pursuant to section 1639d.[5] In 2010 – over two years before section 1639d's effective date – Cantero purchased a home in Queens Village, New York. (Cantero Am. Compl. (18-CV-4157, Doc. No. 6) at ¶ 29.) In connection with the purchase, he entered into a mortgage agreement with the Bank which required him to make monthly payments into a mortgage escrow account maintained by the Bank. (*Id.* at ¶¶ 18, 30.) The agreement provided "that the instrument 'shall be governed by Federal law and the law of jurisdiction in which the Property is located.'" (*Id.* at ¶¶ 31–32.) Cantero's mortgage loan is insured by the FHA. (Dec. 21, 2018 Letter (18-CV-4157, Doc. No. 27) at 1.)

In 2016, the Hymes Plaintiffs purchased a single-family home in East Setauket, New York. (Hymes Compl. (18-CV-2352, Doc. No. 1) at ¶ 13.) Like Cantero, they entered into a mortgage agreement with the Bank which required them to open an escrow account. (*Id.* at ¶¶ 8, 13.) And like Cantero, their agreement provided that it would be "governed by federal law and

---

[5] In their motion papers, both sets of plaintiffs concede this point. (*See* Hymes Opp'n (18-CV-2352, Doc. No 22) at 30; Cantero Opp'n (18-CV-4157, Doc. No. 22) at 24–27.)

the law of New York State." (*Id.* at ¶ 43.) In addition, the agreement stated that the Bank would "not be required to pay . . . any interest or earnings on the Escrow Funds unless . . . Applicable Law requires" otherwise, and it defined "Applicable Law" as "federal law and the law of New York State." (*Id.*) Although the Hymes Plaintiffs' mortgage post-dates section 1639d's effective date, it is not insured by a state or federal agency, and it does not otherwise fall into one of the categories of loans for which section 1639d mandates escrow accounts.[6]

Plaintiffs allege that, although they have continued to make monthly payments into their escrow accounts, the Bank has not paid them any interest as required by both GOL § 5-601 and, by extension, their mortgage agreements. (Hymes Compl. at ¶ 14; Cantero Am. Compl. at ¶ 19.) They further allege that, at the time they entered into their agreements, they reasonably believed they would be paid interest, and that the Bank has known all along of its legal obligations but nonetheless has elected to not pay. (Hymes Compl. at ¶¶ 19, 33–36; Cantero Am. Compl. at ¶¶ 27–28, 58–63.)

On behalf of themselves and a putative class of similarly situated individuals, Plaintiffs assert claims for breach of contract, unjust enrichment, violation of New York General Business Law ("GBL") § 349, and violation of GOL § 5-601. (Hymes Compl. at ¶¶ 33–52; Cantero Am. Compl. at 49–92.)[7] They seek compensatory and punitive damages and injunctive and declaratory relief. (Hymes Compl. at 16; Cantero Am. Compl. at 15–16.)

---

[6] Counsel for the Hymes Plaintiffs conceded this at a consolidated oral argument on the pending motions. (*See* Oral Arg. Tr. (18-CV-4157, Doc. No. 28) at 32.)

[7] Plaintiffs structure their class claims differently but, for the purposes of these motions to dismiss, the differences are immaterial. The Hymes Plaintiffs seek to represent a "New York Class" and a "Multi-State Class," which includes New York. On behalf of the former, they assert claims under New York General Business Law § 349. (Hymes Compl. at ¶¶ 33–41.) On behalf of the latter – customers of the Bank with mortgaged properties in Connecticut, Iowa, Maine, Maryland, Massachusetts, Minnesota, New Hampshire, New York, Oregon, Rhode Island, and Utah – they assert claims for breach of contract and unjust enrichment. (*Id.* at ¶¶ 42–52.) Cantero seeks to represent a single all-encompassing class, which includes customers of the Bank with properties in the same 11 states plus Vermont and Wisconsin. (Cantero Am. Compl. at ¶¶ 57, 79.) In addition, Cantero seeks to assert claims under the consumer protection and escrow laws of each state, which he alleges are "substantially and materially

## VII. The Instant Motions to Dismiss

The Bank moves to dismiss Plaintiffs' complaints for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). The Bank argues, first, that all claims must fail because the NBA preempts GOL § 5-601, and therefore it is not obligated to pay interest on mortgage escrow accounts. (Hymes Mot. (18-CV-2352, Doc. No. 19-1) at 12–29; Cantero Mot. (18-CV-4157, Doc. No. 21-1) at 13–29.) Second, following from this conclusion, it argues that Plaintiffs' breach of contract claims fail because the New York choice-of-law provisions in their mortgage agreements obviously do not incorporate preempted laws like GOL § 5-601. (Hymes Mot. at 30–31; Cantero Mot. at 32–33.) Third, it argues Plaintiffs' unjust enrichment claims are barred because their mortgage agreements cover the subject matter at issue. (Hymes Mot. at 31; Cantero Mot. at 33.) And, fourth, it argues Plaintiffs' GBL § 349 claims fail because they have not alleged the Bank engaged in deceptive acts or practices. (Hymes Mot. at 31–32; Cantero Mot. at 33–34.) The Bank does not make an argument specific to to Plaintiffs' "violation of GOL § 5-601" claims aside from its broader preemption argument.

On December 12, 2018, the parties in both *Hymes* and *Cantero* appeared before then–District Judge Joseph F. Bianco to argue the merits of the Banks' twin motions. (Oral Arg. Tr. (18-CV-2352, Doc. No. 27).) In the months since, this action has been transferred to the undersigned, and the parties have submitted supplemental letter briefs addressing various pertinent issues. The Court has considered the arguments raised in these supplemental submissions.

---

similar" to GOL § 5-601 and GBL § 349. (*Id.*) Whether these class claims can go forward will be addressed upon a motion for class certification.

## STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint need not contain "detailed factual allegations," but it must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). That is, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). The determination of whether "a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 678 (citing *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2d Cir. 2007)).

In deciding a motion to dismiss, a Court may "consider matters of which judicial notice may be taken under Fed .R. Evid. 201." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). This includes "law, legislative facts, or factual matters that are incontrovertible," so long as "there is no dispute as to the authenticity of such materials." *Oneida Indian Nation of N.Y. v. New York*, 691 F.2d 1070, 1086 (2d Cir. 1982). Here, given that no facts are in dispute and the issue before the Court turns purely on a question of law, the Court takes judicial notice of relevant legal authorities, legislative histories, and secondary sources.

**DISCUSSION**

The Court concludes that the NBA does not preempt GOL § 5-601, and therefore that the Plaintiffs' complaints state claims for breach of contract. Because Plaintiffs' contracts govern this dispute, their unjust enrichment claims must be dismissed. Moreover, the Court concludes that the complaints fail to allege deception on the part of the Bank sufficient to state claims for violation of GBL § 349, and, accordingly, those claims also are dismissed.

## I.    NBA Preemption

"National banks are instrumentalities of the federal government created for a public purpose, and as such necessarily subject to the paramount authority of the United States." *McClellan v. Chipman*, 164 U.S. 347, 357 (1896). For the past 200 years, it has been settled that "federal law [is] supreme over state law with respect to national banking." *Watters*, 550 U.S. at 10 (citing *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819)). Thus, state laws that purport to "define the[] duties or control the conduct" of national banks are preempted under the Supremacy Clause. *See Davis v. Elmira Savings Bank*, 161 U.S. 275, 283 (1896). This does not mean, however, that "banks or other corporations or instrumentalities of the [federal] government are to be wholly withdrawn from the operation of State legislation." *First Nat'l Bank*, 76 U.S. (9 Wall.) at 361. To the contrary, as noted above, "it is often said that we have a 'dual banking system' of federal and state regulation." *Burke*, 414 F.3d at 314 (citations omitted). For nearly as long as there has been a National Bank Act, the Supreme Court has recognized a role for state regulation. *See McClellan*, 164 U.S. at 356; *First Nat'l Bank*, 76 U.S. at 361–62. For example, national banks have historically been – and still are – subject to state contract law, tort law, criminal law, and law governing the transfer of real property. *See Watters*, 550 U.S. at 11; *McClellan*, 164 U.S. at 356; 12 C.F.R. 34.4(b).

The question whether the NBA preempts a state law "is basically one of congressional intent. Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State?" *Barnett Bank*, 517 U.S. at 30. Sometimes, the answer is more easily gleaned, as is the case when Congress has clearly stated its intent to preempt state law or, conversely, when it has explicitly made exercise of a banking power "subject to state law." *Id. at* 31, 34 (citing examples of the latter throughout the NBA, including 12 U.S.C. §§ 36(c), 92a(a)). Often, though, Congress will not have spoken explicitly regarding the applicability of a particular state law. In this circumstance, state laws will be preempted only where Congress's preemptive intent can be implied. That is, state laws are implicitly preempted when they conflict with federal law – when adherence with both statutes is a "physical impossibility," *id.* at 31, or when "state law stands as an obstacle to the accomplishment and execution of the full purposes," *Burke*, 414 F.3d at 313–14 (citing, *inter alia*, *Barnett Bank*, 517 U.S. at 31; *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 159–60 (1984)).

In general, when conducting a preemption inquiry, Courts are guided by "the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). In other words, Courts typically employ a presumption against preemption. "The presumption against federal preemption disappears, however, in fields of regulation that have been substantially occupied by federal authority for an extended period of time. Regulation of federally chartered banks is one such area." *Burke*, 414 F.3d at 314 (quoting *Flagg*, 396 F.3d at 183) (citations omitted). Thus, in confronting NBA preemption claims, there is a history of courts "interpreting grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited

by, but rather ordinarily pre-empting, contrary state law." *Barnett Bank*, 517 U.S. at 32

(citations omitted).

Taking stock of this history and of the general principles of preemption, the Supreme

Court in *Barnett Bank* articulated the standard for implied preemption under the NBA as follows:

> In defining the pre-emptive scope of statutes and regulations granting a power to national banks, [our precedents] take the view that normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted. To say this is not to deprive States of the power to regulate national banks, where . . . doing so does not prevent or significantly interfere with the national bank's exercise of its powers.

*Barnett Bank*, 517 U.S. at 33 (citing *Anderson Nat'l Bank v. Luckett*, 321 U.S. 233, 247–252

(1944); *McClellan*, 164 U.S. at 358; *First Nat'l Bank*, 76 U.S. at 362); *accord Watters*, 550 U.S.

at 12 (reiterating *Barnett Bank*'s "prevent or significantly interfere" language). As discussed

above, Congress subsequently codified this standard in the NBA. *See* 12 U.S.C. § 25b(b).

Therefore, as a matter of both statutory and constitutional law, the NBA implicitly preempts a

state law only if it "prevents or significantly interferes with" the national banks' exercise of their

powers.

In this case, the parties agree that Congress has not explicitly spoken to whether the NBA

preempts state laws, like New York's GOL § 5-601, requiring national banks to pay interest on

mortgage escrow accounts. The parties further agree that, therefore, the answer turns on divining

congressional intent through regulations and statutory provisions and, ultimately, through

application of *Barnett Bank*.

Between them, the parties point to three sources of authority bearing on congressional

intent. The first is the NBA itself, which has, for decades, endowed national banks with the

power to engage in real estate lending and activities incidental thereto, but which does not

specifically address escrow lending activities.  *See* 12 U.S.C. §§ 24 (Seventh), 371(a).  The

second is the OCC's preemption regulations, first promulgated in 2004, interpreting the NBA to

permit lending "without regard to state law limitations concerning . . . [e]scrow accounts,

impound accounts, and similar accounts," but saving state laws "made applicable by Federal

law."  12 C.F.R. § 34.4(a), (b)(9).  The third is the 2010 Dodd–Frank Act, in which Congress

simultaneously cabined the authority of the OCC to make preemption determinations and

provided, in law not subject to OCC oversight, that mortgage lenders must pay interest on certain

categories of mortgage escrow accounts "[i]f prescribed by applicable State or Federal law."  *See*

12 U.S.C. § 25b; 15 U.S.C. § 1639d(g)(3).  This case turns on the meaning of these three

authorities.

It should be noted that this appears to be a question of first impression everywhere other

than in the Ninth Circuit.  There, in *Lusnak v. Bank of America, N.A.*, 883 F.3d 1185 (9th Cir.

2018), *cert. denied*, 139 S. Ct. 567 (2018), the Court of Appeals concluded that the NBA does

not preempt California's analogue to GOL § 5-601.  The Court reasoned that section 1639d(g)(3)

"expresses Congress's view that" escrow interest laws "would not necessarily prevent or

significantly interfere with a national bank's operations," and therefore that, under *Barnett Bank*,

the NBA did not preempt the California law.  *Id.* at 1194–95.  With respect to the OCC's 2011

preemption regulations, the Ninth Circuit found them to be "entitled to little, if any, deference,"

given that the agency failed to meaningfully revise them after Dodd–Frank repudiated the

agency's approach to preemption.  *Id.* at 1193.  This Court finds *Lusnak* persuasive and reaches

the same result; however, this Memorandum and Order stands on its own.

Turning to the parties' arguments, the Bank contends that the NBA and the OCC's

preemption regulations each independently preempt GOL § 5-601 under a straightforward

application of *Barnett Bank*. (Hymes Mot. at 14–23; Cantero Mot. at 14–24.) Dodd–Frank, it asserts, did not change things: The preemption regulations continue to be entitled to deference, and section 1639d(g)(3) simply does not require compliance with preempted state laws because a preempted law cannot be an "applicable" one within the meaning of that provision. (Hymes Mot. at 23–29; Cantero Mot. at 24–29.) In support of its arguments, the Bank points to an OCC amicus brief which was originally filed in support of the Bank's unsuccessful motion for en banc review of the *Lusnak* decision. (*See* OCC Brief (18-CV-2352, Doc. No. 19-2).) As relevant, the OCC brief contends, based on its interpretation of case law, that the Bank's positions are correct and the OCC's preemption regulations "directly address[] the issue in this case." (*Id.* at 13–25.)

Plaintiffs respond to each of these arguments in turn. They contend that, although the NBA grants real estate lending powers, GOL § 5-601's modest directive to pay interest on mortgage escrow accounts does not "significantly interfere" with those powers. (Hymes Opp'n (18-CV-2352, Doc. No. 22) at 18–24; Cantero Opp'n (18-CV-4157, Doc. No. 22) at 9–20.) With respect to section 1639d(g)(3), Plaintiffs dispute the Bank's interpretation of "applicable" and argue that, by enacting this provision, Congress signaled its view that laws like GOL § 5-601 could coexist with existing federal banking regulations. (Hymes Opp'n at 24–25; Cantero Opp'n at 22–24.) It follows from this, Plaintiffs argue, that the preemption regulations' exception for state law made applicable by federal law encompasses GOL § 5-601. And they add that the OCC's relatively unexplained determination that the NBA preempts all "limitations on escrow accounts" is not entitled to significant deference. (Hymes Opp'n at 26–30; Cantero Opp'n at 20–22.)

Before applying *Barnett Bank*, it is necessary to resolve the parties' interpretive disagreements regarding the statutory scheme and the OCC's preemption regulations. The Court begins with the statutes.

## A.     NBA, RESPA, and Dodd–Frank

Although the NBA does not itself explicitly address national banks' power to administer mortgage escrow accounts, Congress has not left the subject untouched. Since 1974, RESPA has governed the amounts mortgage lenders, including national banks, may require be deposited in escrow. *See* 12 U.S.C. §§ 2601(a), 2609. And since 1974, Congress has devolved oversight of RESPA upon agencies other than the OCC – to HUD from 1974 to 2010, *see* 88 Stat. at 1274, and to the CFPB thereafter, *see* 124 Stat. at 1965.

The significance of this to the case at hand is twofold. First, it is clear evidence that Congress intended mortgage escrow accounts, even those administered by national banks, to be subject to some measure of consumer protection regulation. Although RESPA is not the same sort of regulation as GOL § 5-601, the two share a unity of purpose. Both are directed to limiting the extent to which borrowers may be separated from control over their money. RESPA limits the amount initially demanded; GOL § 5-601 requires that a modest interest be paid on the amount retained.

Second, RESPA – and all other mortgage-lending legislation dating back to the New Deal – shows that the regulation of the mortgage industry has long transcended the confines of the NBA. Historically, national banks have not been the largest participants in the national mortgage business. Federally chartered savings and loan associations, mortgage companies, state-chartered banks, and other entities have all, at various times, claimed a significant share of the market. *See* Kenneth A. Snowden, RESEARCH INST. FOR HOUS. AM., *Mortgage Banking in the*

*United States, 1870–1940*, at 86 tbl.25 (2014) (listing types of mortgage lender by share of mortgage originations from 1936 to 1939); Peter S. Rose & Richard L. Haney, Jr., *The Players in the Primary Mortgage Market*, 1 J. HOUSING RES. 91, 93 tbl.2 (1990) (listing types of mortgage lender by share of single-family loan originations from 1970 to 1989). In 1974, it would have made no sense for Congress to assign federal regulation of mortgage escrow accounts to the agency charged with oversight of only a fraction of the mortgage market. Nor, for example, would this have made sense in 1968, when Congress enacted TILA to regulate all "creditors." *See* Pub. L. No. 90-321, §§ 103, 105, 82 Stat. 146, 147–48 (1968) (delegating rulemaking authority to the Federal Reserve Board).[8]

In Dodd–Frank, Congress continued this approach with a newfound urgency, enacting a battery of new consumer protection laws applicable to *all* mortgage lenders and consolidating the power to administer them in the CFPB. One such law was section 1639d, which makes mortgage escrow accounts mandatory for large swaths of loans for a minimum of five years, and which requires creditors to "pay interest to the consumer on the amount held in any impound, trust, or escrow account" "[i]f prescribed by applicable State or Federal law." 15 U.S.C. § 1639d(g)(3). The meaning of this provision would appear to be straightforward. Recognizing that escrow accounts offer borrowers "protection against tax liens and the forced placement of insurance," but, at the same time, that such accounts have long been subject to "RESPA and, if applicable, State law," Congress sought to strike a balance: it would require establishment of

---

[8] TILA struck a balance, delegating the authority to promulgate regulations to the Federal Reserve Board (and, after Dodd–Frank, the CFPB), but delegating enforcement to several different agencies based on their expertise and purview. *See* 15 U.S.C. § 1604(a); 82 Stat. at 148. Thus, it vested the OCC with the power to enforce TILA against, *inter alia*, national banks. *See* 12 U.S.C. § 1813(q); 15 U.S.C. § 1607(a)(1)(A).

such accounts, subject to various restrictions and requirements imposed by RESPA and state law. *See* H.R. Rep. No. 111-94, at 49, 53.

The Bank, however, vigorously disputes this interpretation as applied to national banks. It argues that "applicable" means, at least in part, "not preempted." Therefore, to the extent state laws like GOL § 5-601 are preempted by the NBA, they are not incorporated into section 1639d(g)(3) and, consequently, that provision has no bearing on this case. (Hymes Mot. at 25–26; Cantero Mot. at 26–27.) It could not be otherwise, says the Bank, because had Congress intended to "modify" its approach to NBA preemption, thereby permitting state escrow interest laws to govern national banks, it would have done so more explicitly. (Hymes Mot. at 25–26; Cantero Mot. at 26–27.)

The Court is not persuaded that Congress intended "applicable" to create a massive preemption-based exemption for national banks. For the reasons set forth below, the Court concludes that the better reading of section 1639d(g)(3) is that it has nothing to say about preemption one way or the other – that, when Congress wrote the statute and used "applicable" before "State or Federal law," it was not concerned with NBA preemption. Rather, it appears Congress meant "applicable" simply to mean "relevant."

To begin with the text, the Bank takes a too-narrow view of the statute's plain meaning. *See, e.g.*, *Smith v. Berryhill*, 139 S. Ct. 1765, 1774 (2019) ("We begin with the text."). Citing Webster's II New College Dictionary (1999), the Bank defines "applicable" as "able to be applied; appropriate." (Hymes Mot. at 25; Cantero Mot. at 26.) From here, it concludes that, since preempted laws of course are not "able to be applied," "applicable" must mean "not preempted." (Hymes Mot. at 25; Cantero Mot. at 26.) The year after Dodd–Frank's enactment, however, the Supreme Court defined "applicable" more broadly and flexibly to mean "'capable

22

of being applied: having relevance' or 'fit, suitable, or right to be applied: appropriate.'"

*Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 105 (2002)). The task here is to choose among these various meanings.

"The general rule is that the 'meaning of a word, and, consequently, the intention of the legislature,' should be 'ascertained by reference to the context.'" *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 231 (2008) (quoting *Neal v. Clark*, 95 U.S. 704, 709 (1878)). "[A] word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285 (2008). Here, although the surrounding words in section 1639d(g)(3) do little to pinpoint a meaning, they at least suggest that Congress was not thinking in terms of preemption. The provision twice refers to "applicable State *or Federal* law," which can quite naturally be read such that "applicable" modifies "Federal law," and which at best is ambiguous as to which words "applicable" modifies. Had Congress been concerned with preemption – which, of course, does not limit federal laws – it is unlikely it would have taken this approach.[9]

Turning to section 1639d as a whole, "applicable" appears ten times. In the majority of these instances, it is best read as meaning "relevant" or "having relevance," and not "able to be applied." For example, it mandates creating escrow accounts "for the payment of taxes and hazard insurance, and, if applicable" – *i.e.*, if relevant – "flood insurance, mortgage insurance,

---

[9] Focused on the *Lusnak* decision, the Bank points to other language in section 1639d. In *Lusnak*, the Ninth Circuit concluded "that [Congress] used the term 'applicable' to refer to state escrow interest laws where they exist" – *i.e.*, to account for the fact that, at the time, only approximately a dozen states had escrow interest laws. *Lusnak*, 883 F.3d at 1195. The Bank argues this must be wrong because "Congress accounted for the absence of escrow interest laws in some states not with the word 'applicable,' but with the phrase '[i]f prescribed by,'" which appears at the very beginning of section 1639d(g)(3). (Hymes Mot. at 25–26; Cantero Mot. at 26–27.) For "applicable" to mean what the *Lusnak* court says it does, contends the Bank, would render "[i]f prescribed by" surplusage. (Hymes Mot. at 25–26; Cantero Mot. at 26–27.) Because the Court does not interpret "applicable" the same way the Ninth Circuit did, it need not address this argument. It suffices that the Court's reading of "applicable" to mean "relevant" is perfectly compatible with the Bank's chosen reading of "[i]f prescribed by."

ground rents, and any other required periodic payments." *See* 15 U.S.C. § 1639d(a); *see also id.* § 1639d(h)(3)–(5).[10]  Elsewhere, the statute refers to "residence[s] of the applicable size" – *i.e.*, relevant or appropriate size.  *Id.* § 1639d(b)(3)(A)–(B).  It would make no sense in either of these contexts for "applicable" to mean "able to be applied."  Nor would it make sense at all for "applicable" to have anything to do with preemption.[11]

Usage of "applicable" throughout the Act further reinforces the Court's interpretation.  "It is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning."  *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 571, (2012) (internal quotation marks omitted) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995)).  Dodd–Frank repeatedly uses "applicable" to qualify references to state law, federal law, or both.  In every instance, reading "applicable" to mean "relevant" makes sense; whereas reading it to mean "able to be applied" and "not preempted" does not.  Indeed, the statute sometimes inverts the language in section 1639d(g)(3) and refers to "applicable Federal or State law."  *See* 124 Stat. at 1451.  More pertinently, sometimes it simply refers to "applicable Federal law."  *See id.* § 210(a)(16)(D)(ii).  It cannot be the case that Congress nonsensically meant to invoke federal law only to the extent it is not preempted.[12]

---

[10] This usage repeats later in the statute, where "if applicable" is appended to references to premiums on optional insurance policies.  *See id.* § 1639d(h)(3)–(5).

[11] The other two usages in section 1639d are not to the contrary.  One refers to "the law of the State, if applicable," which, just as the passage at issue, is susceptible to being interpreted as either "relevant" or "able to be applied."  *See* 12 U.S.C. § 1639d(g)(2)(C).  The other refers to "applicable fees or costs" associated with not creating an escrow account or with closing an escrow account.  *Id.* § 1639d(j)(2)(A).  This, too, is susceptible of two interpretations.

[12] Beyond these examples, "applicable" appears nearly 350 times throughout the Act.  The Court does not attempt to catalogue all usages here.  It suffices to say that, upon careful review of a significant number of them, it is rarely if ever the case that "applicable" could not naturally be read to mean "relevant."

Next, the Court's interpretation is supported by "the broader structure of the Act." *King v. Burwell*, 135 S. Ct. 2480, 2492 (2015). As the Bank correctly points out, Congress knew how to address preemption when it wanted to. (Hymes Mot. at 26; Cantero Mot. at 27.) Subtitle D of Title X is named "Preservation of State Law," and it establishes rules for when state laws are and are not preempted. (Incidentally, this subtitle never once uses the phrase "applicable State law.") For example, Subtitle D deprives state attorneys general of the power to enforce the Act against national banks in all but some limited circumstances. *See* 124 Stat. at 2012. Section 1639d, and the title in which it is located (Title XIV), does none of these things. Pursuant to its zero-sum approach, the Bank argues that because section 1639d(g)(3) lacks an "explicit statement" of intent to not preempt state laws, it must mean that the provision instead intended to preserve existing preemption rules. But, as the foregoing discussion shows, it is possible and in fact more likely that, in enacting section 1639d, Congress meant nothing with respect to preemption at all.

Although not necessary to the Court's conclusion, legislative history also supports reading section 1639d(g)(3) as the Court does – as not containing a relatively hidden exemption to a mortgage lending rule for the nation's largest mortgage lenders. As detailed earlier in this Order, Congress was acutely aware of the benefits of mortgage escrow accounts, particularly for subprime borrowers, and the risks of issuing home loans without them. *See* H.R. Rep. No. 111-94, at 49, 53–54; *see also Lusnak*, 883 F.3d at 11985. In seeking to increase the use of such accounts, the House Report noted that they must be administered "in accordance with [RESPA], . . . and, if applicable, the law of the State where the real property securing the transaction is located, including making interest payments on the escrow account if required under such laws." *Id.* at 91. Nothing in this passage – other than the Bank's ill-fitting reading of "applicable" –

suggests Congress intended to exempt national banks, who as of 2010 controlled a majority of the mortgage lending market, from this directive.

Bank of America argues that, because "the worst subprime loans were originated by nonbank lenders," section 1639d "was aimed primarily at subjecting these nonbank entities' mortgage lending practices to minimum federal consumer protection standards." (Hymes at 26–27 (citations omitted).) As the Bank surely knows, however, by 2010, many of these nonbank lenders were no longer in business. Two years before, the Bank itself had purchased the largest such lender: Countrywide Financial Corporation. *See* FIN. CRISIS INQUIRY COMM'N, *supra*, at 22. It would have made little sense for Congress to regulate in 2010 as if it were still 2006.

Finally, although the CFPB has not definitively issued a regulation interpreting section 1639d(g)(3), it bears noting that its final rulemaking gives no hint that it believed national banks would be exempted from state escrow interest laws. In a detailed analysis of the rationale for the interest requirement, the notice of rulemaking does not make any distinction between national banks and other creditors. *See Escrow Requirements Under the Truth in Lending Act*, 78 Fed. Reg. at 4726–57. Although it frequently notes that many creditors will not be required to pay interest, the notice attributes this to the fact that some states do not have interest laws – not to the fact that some creditors will be exempt given principles of preemption. Thus, it acknowledges, "[d]epending on the State, the creditor might not be required to pay interest," and "[u]nder some State regulations, creditors are not required to pay interest." *Id.* at 4745, 4757; *accord Lusnak*, 883 F.3d at 1195 (quoting the same language).

In sum, the text and structure of section 1639d, and Dodd–Frank more broadly, compel the conclusion that by "applicable State or Federal law," Congress meant "relevant State or Federal law," and that Congress did not intend to create a preemption-based exception for

national banks.  Thus, although section 1639d(g)(3) does not govern the specific loans at issue in

this case, it is nonetheless significant, for it evinces a clear congressional purpose to subject *all*

mortgage lenders to state escrow interest laws.  As this section began by explaining, this purpose

is not surprising.  Indeed, it is wholly consistent with the history of mortgage-lending regulation

in this country, and with the limited history of mortgage escrow account regulation from

RESPA's enactment to the present.  Congress has determined, again and again, to subject

lenders, including national banks, to reasonable consumer protection laws.  Especially after the

post-crisis consolidation of the mortgage-market in the hands of a few large national banks, it

would be perverse to interpret Congress's latest regulatory effort as obliquely exempting those

banks.  This conclusion does not end the preemption inquiry.  It merely informs it, giving insight

into Congress's intent.

### B. The OCC's Preemption Regulations

The preemption inquiry is also informed by the OCC's regulations.  Where the agency

has issued regulations preempting state law, "[t]he proper focus" is on the content of those

regulations.  *See Burke*, 414 F.3d at 314.  The deference owed to the agency, however, differs

based on the substance of the regulation.  Regulations that reflect the agency's informed

interpretation of its organic statute are entitled to *Chevron* deference.  *See, e.g.*, *id.* at 315–18

(applying *Chevron* to OCC regulations granting banks the power to conduct banking activities

through subsidiaries, subject to the same level of state regulation as the parent bank); *accord*

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).  Such

regulations are binding on courts so long as they represent "a permissible construction of" an

ambiguous statute.  *Chevron*, 467 U.S. at 842.  Regulations that reflect the "agency's conclusion

that . . . state law is pre-empted" receive lesser, *Skidmore* deference.  *See Wyeth v. Levine*, 555

U.S. 555, 576 (2009).  Such regulations guide the court's inquiry only to the extent of their "thoroughness, consistency, and persuasiveness."  *Id.* (citing *United States v. Mead Corp.*, 533 U.S. 218, 234–35 (2001); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Here, the OCC's preemption regulations, codified at 12 C.F.R. § 34.4, plainly fall into the latter category.  *See Lusnak*, 883 F.3d at 1192 ("The Supreme Court . . . has indicated that regulations of this kind should receive, at most, *Skidmore* deference . . . .").  The Bank resists this conclusion, pointing to *Wachovia Bank, N.A. v. Burke*, a 2005 case in which the Second Circuit gave section 34.4 *Chevron* deference.  (Hymes Mot. at 23; Cantero Mot. at 23–24.)[13]  But *Burke* is not fully apposite, and subsequent events have undermined aspects of its approach. First, *Burke* pre-dated the Supreme Court's 2009 decision in *Wyeth v. Levine*, in which the Court made clear that agency conclusions about preemption should receive only *Skidmore* deference. *See* 555 U.S. at 576.  Second, *Burke* also pre-dated Dodd–Frank, in which Congress effectively applied *Wyeth* to the OCC, mandating that courts "assess the validity of [the agency's preemption] determinations, depending upon the thoroughness evident in the consideration of the agency, the validity of the reasoning of the agency, the consistency with other valid determinations made by the agency, and other factors which the court finds persuasive and relevant to its decision."  12 U.S.C. § 25b(b)(5)(A).  Third, *Burke* involved section 34.4 and a collection of other regulations which, together, interpreted the NBA to empower national banks to carry on the full panoply of banking activities through their subsidiaries.  *See Burke*, 414 F.3d at 311–13 (describing the framework created by 12 C.F.R. §§ 5.34, 7.4000, 34.1, 34.4 (2005)).

---

[13] The Bank may have intended to retreat from this position at oral argument when it argued that, under either *Skidmore* or *Chevron*, section 34.4 is entitled to deference.  (*See* Oral Arg. Tr. at 46.)  In an abundance of caution, however, the Court assumes it did not.

There is no analogous regulatory scheme in this case. Accordingly, the Court will afford section 34.4 *Skidmore* deference – deferring to it only to the extent it is persuasive.

Section 34.4 has two subsections: 34.4(a), which contains the list of preempted state laws, and 34.4(b), which sets out a competing list of state laws that are not preempted to the "extent consistent" with *Barnett Bank*, including any law that is "made applicable by Federal law." 12 C.F.R. § 34.4. Subpart (b) is unambiguous, and it plainly applies here. Section 1639d(g)(3) is a "Federal law" and, as explained at length in the preceding section, it makes GOL § 5-601 "applicable" to national banks. Under subpart (b), then, whether GOL § 5-601 is preempted turns on a straightforward application of *Barnett Bank*.

The Bank and the OCC say that subpart (a) supplies just that application, but the Court is not convinced. As the Ninth Circuit explained at length in *Lusnak*, there no evidence that, when the agency first promulgated the regulations in 2004, it had engaged in a careful, considered analysis of whether the NBA preempts state laws limiting escrow accounts. *See Lusnak*, 883 F.3d at 1192–94 ("The OCC did not conduct its own review of specific potential conflicts on the ground."). Nor is there evidence that, at this time, the agency gave any thought whatsoever to the specific question raised in this case, which is whether the NBA preempts *escrow interest laws*. The agency's proposed and final rulemakings do not offer a specific rationale for preempting state laws limiting escrow accounts, and they do not even mention escrow interest laws. *See Real Estate Lending and Appraisals*, 69 Fed. Reg. at 1911–14 (notice of final rule); *Real Estate Lending and Appraisals*, 68 Fed. Reg. at 46,119–32 (notice of proposed rule).[14]

---

[14] This is not to question the persuasiveness of the 2004 regulations more generally, which the Second Circuit, applying a greater level of deference pre-*Wyeth* and Dodd–Frank, found to be reasonable. *See Burke*, 414 F.3d at 320–21. The point is that, with respect to mortgage escrow accounts generally and state escrow interest laws more specifically, the 2004 rulemakings did not say anything at all.

The agency's 2011 regulations, which updated the 2004 regulations in the wake of Dodd–Frank, did nothing to remedy this oversight. Explaining that it had "re-reviewed" the list of preempted state laws "to confirm that the specific types of laws cited in the rules are consistent with the standard for conflict preemption," the OCC declined to amend the list. *Dodd–Frank Act Implementation*, 76 Fed. Reg. at 43,557. But, once again, the agency did not get more specific. It failed to explain why or to what extent the NBA preempted state laws limiting escrow accounts, and it did not mention escrow interest laws. It is therefore difficult to conclude that the OCC has ever considered the question before the Court. And to the extent it has, its regulations do nothing to persuade the Court that it answered the question thoughtfully or carefully. *See* 12 U.S.C. § 25b(b)(5)(A); *Wyeth*, 555 U.S. at 576.

Urging the opposite conclusion, the Bank points to two other categories on the list of preempted state laws, those limiting "[t]he terms of credit," and those limiting "the ability of a creditor to require or obtain . . . risk mitigants," and it argues both should be read to encompass escrow interest laws. (*See* Hymes Mot. at 21 (quoting 12 C.F.R. 34.4(a)(2), (4), (6)); Cantero Mot. at 22 (same).) But these categories suffer from exactly the same deficiencies the "escrow accounts" category does. They are strikingly broad, and nothing about them suggests that the OCC considered whether, under *Barnett Bank*, the NBA preempts state escrow interest laws.

To the extent the Bank is instead arguing that subsection (a) represents the OCC's considered view that all state laws that could even arguably affect terms of credit, risk mitigants, or escrow accounts are preempted, the Court disagrees. Such a blunderbuss approach to preemption would run headlong into Dodd–Frank. Through that Act, Congress limited the OCC's power to effect preemption by prescribing *Skidmore* deference for all preemption determinations and mandating that future determinations affecting state consumer protection

laws be made on a case-by-case basis in consultation with the CFPB. *See* 12 U.S.C. §

25b(b)(1)(B), (b)(3), (b)(5)(A). Congress also consolidated the power to administer consumer

protection laws in the CFPB, and it decided that, in some instances, state laws should govern.

*See* 15 U.S.C. § 1639d(g)(3). The Court cannot subscribe to reading section 34.4 as thoroughly

disregarding these developments.

Finally, the Court is not persuaded by, and has no obligation to defer to, the view

expressed in the OCC's Ninth Circuit amicus brief that "12 C.F.R. § 34.4[] directly addresses the

issue in this case." (OCC Brief at 17.) First, the Ninth Circuit implicitly declined to defer to the

agency's interpretation when it rejected the Bank's petition for en banc review. Second, under

*Auer v. Robbins*, 519 U.S. 452 (1997), agency interpretations of their own regulations "become[]

of controlling weight unless . . . plainly erroneous or inconsistent with the regulation[s]." *Bowles*

*v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945); *accord Auer*, 519 U.S. at 461. But as the

Supreme Court has very recently explained, there are several important exceptions to *Auer*. *See*

*Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–18 (2019). One of them applies when the agency's

interpretation does not "in some way implicate its substantive expertise." *Id.* at 2417. Then, the

agency's interpretation merits deference only to the extent it has the "power to persuade." *Id.* at

2414. Here, the OCC's interpretation does not in any way implicate the agency's substantive

expertise. It is based almost exclusively on the agency's analysis, in the brief, of relevant case

law. (OCC Brief at 13–25.) Analysis of case law, as a general rule, falls squarely within the

expertise the federal courts, not agencies. *See, e.g.*, *New York v. Shalala*, 119 F.3d 175, 180 (2d

Cir. 1997) ("[A]n agency has no special competence or role in interpreting a judicial decision.");

*cf. Kisor*, 139 S. Ct. at 2417 ("Some interpretive issues may fall more naturally into a judge's

bailiwick."). And when it comes to the OCC in particular, Congress has made it abundantly

clear that courts are not to give any heightened deference to the agency's views on NBA preemption. *See* 12 U.S.C. § 25b(b)(5)(A); *cf. Kisor*, 139 S. Ct. at 2414 ("[W]e presume that Congress intended courts to defer to agencies when they interpret their own ambiguous rules. But when the reasons for that presumption do not apply . . courts should not give deference . . . ."). Moreover, the one short sentence in the brief which speaks to the OCC's deliberative process in enacting section 34.4 – "[b]y the time of the promulgation of the 2004 regulations, the OCC's judgement had been informed by several years of litigation experience," (OCC Brief at 18) – does nothing but parrot the 2004 rulemaking, and it does not provide specific support for the OCC's interpretation of section 34.4. *See Real Estate Lending and Appraisals*, 69 Fed. Reg. at 1908 ("As we have learned from our experience supervising national banks, . . . by the extent of litigation in recent years . . . national banks' ability to conduct operations . . . has been curtailed . . . ."). Accordingly, the OCC's amicus brief is relevant here only to the extent it is persuasive, and for the reasons already explained in this section, the Court does not find its interpretation of section 34.4 persuasive.

The Court concludes that section 34.4 does not preempt GOL § 5-601, and, as a guide to congressional intent on the narrow question at hand, it has little to offer. In subpart (b), the regulation unambiguously exempts state laws "made applicable by Federal law," leaving the question of their preemption up to an individualized application of *Barnett Bank*. 12 C.F.R. § 34.4(b). In subpart (a), the regulation fails to supply that individualized application. There is little evidence to suggest the OCC's decision to retain "escrow accounts" on the list after Dodd–Frank was the product of reasoned judgment, and there is no evidence whatsoever to suggest the OCC considered escrow interest laws when drafting or revising that provision. Thus, the only clear directive from the OCC is to apply *Barnett Bank*. It is to this task that the Court now turns.

### C.    Application of *Barnett Bank*

*Barnett Bank* holds that state laws which "prevent or significantly interfere" with banking

powers are preempted.  In its most recent recitation of the standard, the Supreme Court described

it thus:

> States are permitted to regulate the activities of national banks where
> doing so does not prevent or significantly interfere with the national
> bank's or the national bank regulator's exercise of its powers. But
> when state prescriptions significantly impair the exercise of
> authority, enumerated or incidental under the NBA, the State's
> regulations must give way.

*Watters*, 550 U.S. at 12 (citing *Barnett Bank*, 517 U.S. at 32–34; *Franklin Nat'l Bank of Franklin*

*Square v. New York*, 347 U.S. 373, 377–79 (1954)).  The analysis proceeds in two steps.  The

Court must first determine what banking powers are at issue.  Then, it must determine whether

state law prevents or significantly interferes with the exercise of those powers.  *See Barnett*

*Bank*, 517 U.S. at 30.

Here, the Court agrees with the Bank that the specific banking power at issue is "the

power to provide escrow services."  (Hymes Mot. at 15; Cantero Mot. at 16.)  Section 371

authorizes national banks to "make, arrange, purchase or sell loans or extensions of credit

secured by liens on interests in real estate," 12 U.S.C. § 371(a), and section 24 grants them "all

such incidental powers as shall be necessary to carry on the business of banking," *id.* § 24

(Seventh).  Although neither the NBA nor its formal implementing regulations get more specific,

the OCC has, since at least the late 1990s, interpreted these statutory grants to authorize banks to

"provide real estate closing and escrow services to their loan or title policy customers as

activities that are part of or incidental to the business of banking."  OCC Corporate Decision No.

99-06, 1999 WL 74103, at *2 (citing 12 U.S.C. § 24 (Seventh)).  This makes sense as a matter of

practice and policy.  As the Bank points out, "[b]anks often are unwilling to make secured

mortgage loans without these escrow accounts." (Hymes Mot. at 15 (citing Bruce E. Foote, CONG. RESEARCH SERV., 98-979, MORTGAGE ESCROW ACCOUNTS: AN ANALYSIS OF THE ISSUES 1 (1998)); Cantero Mot. at 16 (same).) And in the wake of the consolidation of the mortgage market in the hands of national banks and Dodd–Frank mandating the creation of escrow accounts for a significant share of that market, it is untenable to think national banks lack the power to maintain such accounts.

The question then becomes whether GOL § 5-601 "significantly interferes with" (no one argues it "prevents") banks' exercise of their power to administer mortgage escrow accounts. The Supreme Court has never explained in detail what this standard entails. At minimum, obviously, state laws that merely affect or minimally impact the exercise of banking powers are not preempted. As noted earlier, national banks are subject to an array of state laws – contract law, tort law, criminal law, law regarding the transfer of real property – which apparently fall into this category. *See* 12 C.F.R. § 34.4(a); *see also McClellan*, 164 U.S. at 358 (holding law governing real estate transfers not preempted). The interference must be "significant" in a way these laws are not. The standard's different linguistic formulations bear this out – *Barnett Bank* favorably cited cases framing the question as whether the state law "unlawfully encroaches" or "destroys or hampers" the exercise of banking power. *Barnett Bank*, 517 U.S. at 33–34 (citations omitted).

A closer examination of precedent further illuminates the standard's contours. For example, in *Anderson National Bank v. Luckett*, one of the principal cases on which *Barnett Bank* relied, the Supreme Court upheld a Kentucky escheat law requiring banks "to turn over to the state, deposits which have remained inactive and unclaimed for specified periods," and to "file reports of inactive accounts" with the state. 321 U.S. at 236, 252–53. The banking power

with which it interfered was the authorization, in 12 U.S.C. § 24 (Seventh), to "receiv[e] deposits." But the Supreme Court concluded the interference was minimal, reasoning that the state law would not "deter [customers] from placing their funds in national banks." *Id.* at 252. The Court continued, "It cannot be said that it would have that effect, more than would the tax laws, the attachment laws, or the laws for the administration of estates of decedents . . . which a state may maintain and apply to depositors in national banks." *Id.*

In *Franklin National Bank of Franklin Square v. New York*, another case relied on by *Barnett Bank*, the Supreme Court again considered a state law that interfered with the power to "receive deposits," but it reached a different conclusion. 347 U.S. 373. The challenged New York statute prohibited national banks, other than savings banks, from using the words "'saving' or 'savings,' or their equivalent in relation to [their] banking or financial business," or "in any way solicit[ing] or receiv[ing] deposits as a savings bank." *Id.* at 374–75. In other words, whereas the NBA expressly authorized banks to receive deposits, state law prevented them from in any way communicating this fact to prospective customers. Finding the state statute to be preempted, the Court observed that it could not subscribe to "an interpretation that would permit a national bank to engage in a business but gave no right to let the public know about it." *Id.* at 377–78.

*Barnett Bank* itself is of a piece with *Franklin National Bank.* In *Barnett Bank*, the federal provision at issue authorized national banks located in small towns to "act as the agent for any fire, life, or other insurance company authorized by the authorities of the State . . . by soliciting and selling insurance." *Barnett Bank*, 517 U.S. at 28 (quoting Act of Sept. 7, 1916, 39 Stat. 753) (alterations in original). A competing Florida statute directly prohibited the exercise of this power by barring insurance agents associated with "financial institutions" from operating

within the state. *Id.* at 29. The Court had little trouble finding that this law significantly interfered with federal purposes.[15]

Applying these precedents, the Court concludes GOL § 5-601 does not "significantly interfere" with national banks' power to administer mortgage escrow accounts. Compared to the state laws in *Barnett Bank* and *Franklin National Bank*, GOL § 5-601's degree of interference is minimal. It requires the Bank to pay interest on the comparatively small sums deposited in mortgage escrow accounts. It does not bar the creation of mortgage escrow accounts, or subject them to state visitorial control, or otherwise limit the terms of their use. As a court interpreting GOL § 5-601 shortly after its enactment put it, "All New York State has done is to act upon funds which are kept by [the Bank] for the ultimate benefit of the original homeowner-mortgagor." *Nat'l Mortg. Ass'n v. Lefkowitz*, 390 F. Supp. 1364, 1369 (S.D.N.Y. 1975).

Unlike in *Barnett Bank* and *Franklin National Bank*, the cost of compliance with the state law is not practical abrogation of the banking power at issue. As the Bank concedes, it could continue to make escrow accounts available and either "use other means" to mitigate credit risk or "do nothing and assume greater risk." (Hymes Mot. at 17; Cantero Mot. at 18.) National banks already do these things to accommodate other, not-preempted state laws. Foreclosure law, for example, which has "historically . . . been within a state's purview," *Real Estate Lending and Appraisals*, 69 Fed. Reg. at 1212 n.59, has a direct impact on credit risk. *See generally* Cem Remiroglu *et al.*, *State Foreclosure Laws and the Incidence of Mortgage Default*, 57 J.L. & ECON. 225 (2014) (measuring the relation between various state foreclosure schemes and rates of

---

[15] The primary analytical question in *Barnett Bank* was not what constitutes "significant interference" – as noted, the case dedicates little attention to elaborating that phrase – but instead whether the federal statute, in using permissive language (as in, "you may sell insurance") rather than mandatory language ("you must sell insurance") imparted only a limited power that was subject to state regulation. *Barnett Bank*, 517 U.S. at 31–33. The Court concluded it did not. *Id.*

default).  There is nothing to suggest that compliance with mortgage escrow interest laws would more significantly interfere with national banking powers than compliance with foreclosure laws already does.  *See Luckett*, 321 U.S. at 252.  Nor does it appear that, by passing the credit risk back to customers by raising fees or rates, the Bank would thereby lose significant business. Wells Fargo, one of its largest competitors and a fellow national bank, already complies with GOL § 5-601 and its analogues in other states.[16]

Of course, compliance with GOL § 5-601 will cost the Bank money, as will compliance with its analogues in other states.  But as the Supreme Court's precedents illustrate, "significant interference" is not a question of cost – it is not this Court's role to determine the bottom-line impact of escrow interest laws on the business operations of national banks, or to allocate the benefits of mortgage lending between borrower and lender.  Such policy judgments are the domain of legislatures.  The "significant interference" test is a question of law.  It asks the Court, simply, to determine whether the power specifically authorized by Congress may be exercised relatively unimpaired and unhampered by the state law.  *See Barnett Bank*, 517 U.S. at 33–34.  In *Barnett Bank* and *Franklin National Bank*, application of the state law would have practically nullified a specific grant of power.  Here, there is no evidence that application of GOL § 5-601 would cause anything approaching this level of interference.

Moreover, through Dodd–Frank, Congress has explicitly required creditors, including national banks, to pay interest in accordance with state laws to a broad swath of borrowers.  *See* 15 U.S.C. § 1639d(g)(3).  Given that the purpose of a preemption inquiry is to determine

---

[16] For the purposes of these motions to dismiss, the Court accepts as true Cantero's allegation to this effect.  (*See* Cantero Mot. at 5 n.2 ("Defendant's uniform policy . . . is at odds with other mortgage lenders such as Wells Fargo Bank, N.A., the largest mortgage originator in the United States, which complies with New York law and pays interest on escrow accounts.")).  However, this allegation is not material to the *Barnett Bank* analysis.

congressional intent, *see Barnett Bank* 517 U.S. at 30, the Court cannot disregard the latest word from Congress. As discussed earlier, this is not to say that, through section 1639d, Congress announced that the NBA would never preempt state escrow interest laws. *See supra*, section I.A. A state escrow interest law "setting punitively high rates" could very well significantly interfere with national banks' power to administer escrow accounts. *See Lusnak*, 883 F.3d at 1195 n.7. Rather, section 1639d evinces a policy judgment that there is little incompatibility between requiring mortgage lenders to maintain escrow accounts and requiring them to pay a reasonable rate of interest on sums thereby received. *Cf. id.* at 1194–95 (observing that section 1639d "expresses Congress's view that such laws would not necessarily prevent or significantly interfere with a national bank's operations"). It is this Court's job to give effect to that judgment.

The cases the Bank cites are all distinguishable on this ground; none featured a law like section 1639d(g)(3). Instead, exemplifying the typical NBA preemption case, they relied on comprehensive OCC rules, interpretive letters, and the like to discern congressional intent. *See Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712, 723–24 (9th Cir. 2012) (relying on 12 C.F.R. § 7.4002 and subsequent OCC interpretive letters); *Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1197–98 (11th Cir. 2011) (relying on 12 C.F.R. § 7.4002); *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 280–81, 283 (6th Cir. 2009) (relying on 12 C.F.R. § 7.4002); *Rose v. Chase Bank, USA, N.A.*, 513 F.3d 1032, 1035–36 (9th Cir. 2008) (relying on 12 C.F.R. § 7.4008); *SPGGC v. Ayotte*, 488 F.3d 525, 531–33 (1st Cir. 2007) (relying on 12 C.F.R. § 7.5002 and subsequent OCC bulletins); *Wells Fargo Bank of Tex., N.A. v. James*, 321 F.3d 488, 490–93 (5th Cir. 2003) (relying on 12 C.F.R. § 7.4002); *Bank of America v. San Francisco*, 309 F.3d 551, 561–64 (9th Cir. 2002) (relying on 12 C.F.R. §§ 7.4002, 7.4003 and subsequent OCC

interpretive letters).  Or they relied on the plain language of the NBA itself.  *See Pacific Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 352 (2d Cir. 2008) (relying on the express grant of power in 12 U.S.C. § 85).

Moreover, even setting aside section 1639d(g)(3), nearly all of these cases are distinguishable on the ground that they featured a conflict between national banks' power to set fees and state laws directly restricting or eliminating that power.  *See Gutierrez*, 704 F.3d at 717 (overdraft fees); *Baptista*, 640 F.3d at 1194 (check-cashing fees); *Monroe Retail*, 589 F.3d at 283–84 (garnishment processing fees at one dollar); *James*, 321 F.3d at 488 (check-cashing fees); *San Francisco*, 309 F.3d at 556 (ATM fees).[17]  As for the remaining two cases, both of which were decided before Dodd–Frank, they are simply not instructive as to what constitutes "significant interference."  *See Rose*, 513 F.3d at 1036–38; *Ayotte*, 488 F.3d at 528–33.  In *SPGGC v. Ayotte*, the First Circuit concluded that a New Hampshire law prohibiting selling gift cards under $100 if they were subject to fees and expiration dates "significantly interfered" with national banks' power to issue gift cards.  488 F.3d at 528–33.  And *Rose v. Chase Bank, USA, N.A.*, the Ninth Circuit concluded that a California law requiring banks (and other covered entities) to print certain disclosures when extending credit to their customers through checks

---

[17] The Court is not convinced by the Bank's argument that, because fees and interest are two sides of the same coin, both "core pricing decisions essential to establishing the terms on which a bank makes a mortgage loan," these cases must control the outcome here.  (Hymes Reply at 10; Cantero Reply (18-CV-4157, Doc. No. 23) at 8 n.2.)  First, as just explained, the *Barnett Bank* test is not about significant interference with national banks' balance sheets – it is about significant interference with the exercise of banking powers granted by Congress.  The banking power asserted in these cases was the power to set fees only – not the power to set interest rates.  The NBA does, in fact, empower national banks to set interest rates, but it explicitly subjects the exercise of this power to state law.  *See* 12 U.S.C. § 85.  The Court will not second-guess Congress's obvious judgment to treat national banks' fee powers and interest-rate powers as distinct.  Second, the Bank's argument proves too much.  It is difficult to imagine what state laws would not, in some way, impact the Bank's "pricing decisions."  Compliance with state regulations costs money.  National banks are free to elect whether to absorb the cost or attempt to pass it along to consumers in the form of heightened fees.  But just because a state regulation might impel a national bank to raise its fees does not thereby transmute that regulation into a limitation on the bank's fee-setting power.  Were this the case, the fee power would effectively preempt the field of national banking regulation.

"significantly interfered" with national banks' power to make non–real estate loans.  513 F.3d at 1036–38.  Neither case explained why the challenged state laws occasioned *significant* interference or offered a view of what less-than-significant interference might look like.  Indeed, neither case analyzed the meaning of "significant interference" at all.  Although the Court does not question the results reached in either case, it finds neither one persuasive here.

Finally, the Court does not agree with the Bank that the Second Circuit's reasoning in *Flagg v. Yonkers Savings & Loan Association, N.A.* "applies equally" to this case.  In *Flagg*, the Circuit held that the Home Owners' Loan Act of 1933 ("HOLA"), 12 U.S.C. § 1461 *et seq.*, preempts GOL § 5-601's application to federal savings associations.  *Flagg*, 396 F.3d at 181.  As the Bank acknowledges, because the case involved application of field preemption standards pursuant to HOLA rather than the conflict preemption standards under the NBA, *Flagg* does not govern the outcome of this case.  (Hymes Mot. at 18–19; Cantero Mot. at 19.)  But *Flagg* differed in another way, too:  the preemption question had already been decided by the district court, and the only issue for the Circuit on appeal was whether the Office of Thrift Supervision ("OTS") had acted arbitrarily or unreasonably in promulgating its preemption regulations.  *Flagg*, 396 F.3d at 182 ("On appeal the Flaggs do not contest the District Court's determination that the OTS has preempted state law . . . .").  Concluding it had not, the Circuit "recognize[d] the potential interest that the OTS has in providing for consistency across the field of mortgage accounts offered by federal savings associations" and observed that, in preempting GOL § 5-601 and similar laws, OTS "provide[d] a consistent nationwide playing field while giving individual institutions a level of flexibility."  *Id.* at 184.  If the issue here were whether OCC's preemption regulations were arbitrary, this reasoning might indeed apply with equal force.  But it is not.  The question is whether, in view of a different statutory scheme that is less predisposed to

preemption, and in view of section 1639d, Congress intended laws like GOL § 5-601 be preempted. For all the reasons explained above, the Court concludes that it did not.

In demarcating the permissible boundaries within which state law may operate in a way consonant with the federal design, the guiding principle is the intent of Congress. *See Barnett Bank*, 517 U.S. at 30. At bottom, this case is about how to reconcile two acts of Congress that, to some extent, speak past each other. Section 1639d(g)(3) represents Congress's judgment that mortgage lenders can comply with reasonable state escrow interest laws. The NBA, however, represents Congress's judgment that national banks' power to engage in mortgage lending and offer escrow services is a "grant[] of authority not normally limited by, but rather ordinarily preempting, contrary state law." *Id.* at 32. If Congress had the NBA in mind when it enacted section 1639d, it is not obvious. Nevertheless, the two acts can be read harmoniously, and they must be so read if each is to be given full effect. As the Supreme Court has explained, "[i]n the final analysis, there can be no one crystal clear distinctly marked formula. Our primary function is to determine whether, under the circumstances of this particular case, [the state's] law stands as an obstacle to the accomplishment and execution of the *full* purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (emphasis added). Here, in view of the purposes and objectives of Congress expressed in both the NBA and Dodd–Frank, the Court concludes that GOL § 5-601 is not – and has never been[18] – such obstacle. Bank of America's motions to dismiss on this ground are denied.

---

[18] The test for NBA preemption has been the same since at least 1996, when the Supreme Court decided *Barnett Bank*. Although this Court's application of the test has been informed by Dodd–Frank, it has not depended on it. The Court's conclusion that the NBA does not preempt GOL § 5-601 therefore applies equally to the time periods before and after Dodd–Frank became effective. And, as relevant to this case, it means that GOL § 5-601 was not preempted at the time Cantero purchased his home in 2010. (*See* Cantero Mot. at 29–32.) This result is consistent with that reached in *Lusnak*. *See Lusnak*, 883 F.3d at 1197. It is also consistent with the Court's interpretation of section 1639d(g)(3) as a provision that was not intended to impact NBA preemption one way or another.

## II.    Plaintiffs' Claims

Plaintiffs assert claims against the Bank for breach of contract; unjust enrichment; and violation of New York's consumer protection statute, GBL § 349.  The Bank moves to dismiss.[19] For the reasons explained next, the Bank's motions are denied with respect to the breach of contract claims, and they are granted with respect to the unjust enrichment and GBL § 349 claims.

### A.    Breach of Contract

Under New York law, there are four elements to a breach of contract claim:  "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  *Katz v. Travelers*, 241 F. Supp. 3d 397, 405 (E.D.N.Y. 2017) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).  Here, the Bank's sole argument for dismissal of these claims is predicated on its incorrect view that GOL § 5-601 is preempted.  It argues that the Plaintiffs cannot show breach because the relevant choice-of-law provisions in their mortgage agreements do not refer to preempted state law.  (Hymes Mot. at 30–31; Cantero Mot. at 32–33.)  Because GOL § 5-601 is not preempted, and the Bank has offered no other legal reason to doubt that it therefore governs the mortgage agreements at issue, the Bank's motions to dismiss these claims are denied.

### B.    Unjust Enrichment

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that 'equity and good

---

[19] Plaintiffs also purport to assert claims for "violation of" GOL § 5-601.  (Hymes Compl. at ¶¶ 39–41; Cantero Am. Compl. at ¶¶ 73–82.)  This does not, however, appear to be an independent cause of action.  Plaintiffs point to no authority that GOL § 5-601 created a private right of action, and the Court is aware of none.  In its motions to dismiss, although the Bank argues in general that all claims should be dismissed on the basis of its preemption defense, it does not specifically address the viability of the GOL § 5-601 claims.  Nor, in their opposition briefing, do Plaintiffs explain the legal basis for these claims.  As the parties have not addressed this issue, the Court will not reach it here.

conscience' require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (citation omitted). Moreover, an unjust enrichment claim is quasi-contractual, meaning that it does not lie when a valid contract governs the subject matter of the dispute. *See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586–87 (2d Cir. 2006) ("It is an obligation the law creates in the absence of any agreement." (quoting *Goldman v. Metro. Life Ins. Co.*, 841 N.E.2d 742 (N.Y. 2005))); *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." (citations omitted)).

Here, both the Hymes Plaintiffs and Cantero plead unjust enrichment in the alternative to their contract claims seeking recovery of escrow interest payments. (Hymes Compl. at ¶¶ 48–52; Cantero Am. Compl. at ¶¶ 83–85, 90–92.) Because their mortgage agreements expressly govern such payments, their unjust enrichment claims must be dismissed. *See, e.g.*, *Cont'l Cas. Co. v. Contest Promotions NY, LLC*, No. 15-CV-501 (MKB), 2016 WL 1255726, at *4 (E.D.N.Y. Mar. 28, 2016) ("Because this dispute is governed by a valid contract, Plaintiff is not entitled to recover on an unjust enrichment theory.")

Cantero additionally alleges that the Bank was unjustly enriched when it "use[d] the amounts it was obligated to pay as interest to generate float income." (Cantero Am. Compl. at ¶ 86.) It argues this income is "distinct" from the interest and therefore a "plausible independent basis for this claim." (Cantero Opp'n at 29.) Far from being distinct, however, money a defendant makes through "having use of another person's money for a specified period," is recoverable as prejudgment interest. *Mohassel v. Fenwick*, 832 N.E.2d 1174, 1178 (N.Y. 2005) (citations omitted). "Under New York law, a plaintiff who prevails on a claim for breach of

contract is entitled to prejudgment interest as a matter of right." *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 698 (2d Cir. 1991) (citing, *inter alia*, N.Y. C.P.L.R. §§ 5001, 5002). Because Cantero can recover all the money he seeks through his contract claim, he is not entitled to simultaneously pursue recovery of a portion of that money through an unjust enrichment claim. *See Cont'l Cas. Co.*, 2016 WL 1255726, at *4; *cf. In re Bayou Grp., LLC*, 439 B.R. 284, 337 (S.D.N.Y. 2010) (noting that New York's pre-judgment interest statutes "do[] not provide an independent cause of action").

### C.   General Business Law § 349

GBL § 349 provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are . . . unlawful." "To maintain a cause of action under § 349, a plaintiff must show:  (1) that the defendant's conduct is 'consumer-oriented'; (2) that the defendant is engaged in a 'deceptive act or practice'; and (3) that the plaintiff was injured by this practice." *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, N.A., 647 N.E.2d 741, 744–45 (N.Y. 1995)). A "deceptive act or practice" is one that is "deceptive or misleading in a material way." *Sanchez v. Ehrlich*, No. 16-CV-8677 (LAP), 2018 WL 2084147, at *10 (S.D.N.Y. Mar. 29, 2018) (quoting *Oswego Laborers' Local 214 Pension Fund*, 647 N.E.2d at 744). In other words, it must be "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* (citation omitted). An act "is not deceptive simply because it is mistaken." *Shapiro v. Berkshire Life Ins. Co.*, 212 F.3d 121, 127 (2d Cir. 2000).

Here, Plaintiffs fail to allege the existence of a deceptive act or practice. The Hymes Plaintiffs' complaint does not offer anything more than the most conclusory allegations to this effect. (Hymes Compl. at ¶ 34 ("Defendant committed and continues to commit deceptive and

unlawful business acts and practices by failing to pay interest . . . .").)  Cantero's amended

complaint does more.  It alleges that the Bank was "aware of the applicable law," promised to

follow it, and then forewent paying interest.  (Cantero Am. Compl. at ¶¶ 62–63.)  But these

allegations do not plausibly allege anything deceptive.  They only beg the question:  what

"applicable law" did the Bank believe it was following?  For Cantero's claim to survive, he

would need to allege the Bank believed GOL § 5-601 to be applicable law, promised him he

would be paid interest accordingly, and then failed to do so.  This, he did not do.  In fact, the

only fair inference to be drawn from nearly everything else in his complaint is that the Bank did

*not* believe it was required to follow GOL § 5-601.  (*See* Cantero Am. Compl. at ¶ 28

("Defendant systematically refuses to pay interest on funds held in escrow accounts . . . .").)

Accordingly, his GBL § 349 claim, along with the Hymes Plaintiffs', must be dismissed.  *See*

*Shapiro*, 212 F.3d at 127.[20]

## CONCLUSION

Bank of America's motions to dismiss (18-CV-2352, Doc. No. 19; 18-CV-4157, Doc.

No. 21) are granted in part and denied in part.  The Court concludes that the National Bank Act

does not preempt New York General Obligations Law § 5-601.  Accordingly, Plaintiffs'

_____

[20] In their oppositions to the Bank's motions, Plaintiffs cite to notices they received from the Bank informing them that, based on the Bank's view of the law, it would not pay interest on their escrow funds.  (Hymes Opp'n at 32; Cantero Opp'n at 30.)  Given that Plaintiffs did not plead details about or otherwise reference the notices in their complaints, the Court will not rely on them to decide the instant motion. *See, e.g.*, *Palin v. N.Y. Times Co.*, 2019 WL 3558545, at *3 (2d Cir. Aug. 6, 2019) (slip op.) (Under Rule 12(b), "matters outside the pleadings" are not to be considered on motions to dismiss.).  However, it bears noting that the notices only further support the Bank's position.  Each one clearly and simply explained that, based on the Bank's view of the law, customers would not be paid interest on their escrow accounts.  (Hymes Notice (Doc. No. 19-5) at 1; Cantero Notice (Doc. No. 21-4) at 1.)  Thus, although the Bank may have erroneously withheld fees, there can be no contention that it attempted to deceive Plaintiffs along the way. *See Silvester v. Selene Fin., LP*, No. 7:18-CV-02425 (NSR), 2019 WL 1316475, at *10 (S.D.N.Y. Mar. 21, 2019) ("The loan agreement clearly provided for these additional charges and, therefore, Plaintiff has failed to allege how they were materially deceptive . . . .").

complaints state valid claims for breach of contract. Plaintiffs' claims for unjust enrichment and violation of New York General Business Law § 349 are dismissed.

SO ORDERED.

Dated: Brooklyn, New York
      September 30, 2019

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge